**In re PROMEDCO OF LOS CRUCES, et al., Debtors.**

**No. 00–46863–BJH–11.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

April 8, 2002.

---

Joseph Colvin, Fort Worth, TX, Mark J. Petrocchi, Hugh Ray, Robin Russell, Houston, TX, Jason Brookner, Dallas, TX, for debtors.

Herbert W. Linder, Cleveland, OH, David B. Coffin, Oklahoma City, OK, for plaintiff.

### MEMORANDUM OPINION AND ORDER

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the Court[1] is the objection of Debtors (the "Objection") to claim no. 115 filed by the Internal Revenue Service ("IRS") in the amount of $3,001,238 (the "Claim")[2] based on the IRS's contention that Debtors[3] underpaid their 1997 taxes.

---

1. The case of these debtors is pending before Hon. Barbara J. Houser. This Court was designated by Judge Houser to hear only this specific matter.

2. The Claim is based on a number of adjustments asserted by the IRS. The Objection raises many issues concerning those adjustments. This Court is to consider only one adjustment, referred to by the parties as "Is-sue K." Moreover, Debtors challenge Issue K on two bases. This Court has been designated only to consider one of the theories put forward in the Objection in opposition to the position of the IRS on Issue K.

3. There are more Debtors than there were entities that reported taxes in 1997. Unless otherwise indicated herein, the term "Debt-

Jurisdiction over this core proceeding lies in the bankruptcy court pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. *See* FED. R. BANKR.P. 7052 and 9014.

## I. *Background*

Debtors were engaged in the business of providing management services to medical practices (singly a "Practice Group" and collectively "Practice Groups"). A Debtor would acquire the assets of a Practice Group.[4] The Debtor would typically retain any non-medical personnel of the acquired entity. The acquiring Debtor, pursuant to a contract denominated as a "Service Agreement", would then manage the business affairs of the Practice Group (under the supervision of a Policy Council made up of equal numbers of the Debtor's employees and the Practice Group's medical professionals). The Debtor maintained a patient billing system for the Practice Group, collected the revenues generated by the Practice Group, paid the expenses of the Practice Group and then split the remaining funds, with 15–20% (depending on the individual contract) going to the Debtor and the balance payable to the owners of the medical practice.[5] Basic accounting entries for the Debtor and the

Practice Group were jointly maintained and were drawn upon by the Debtor to generate accounting reports for both itself and the corresponding Practice Group.

In 1999 the IRS undertook an audit of Debtors' 1997 and 1998 tax returns.[6] The audit was supervised by IRS Agent Denise McCaskill ("McCaskill") who concluded, *inter alia*, that Debtors had understated their gross income through improper accrual of deductions for bad debts. This adjustment (Issue K) accounted for the bulk of the $8,124,366.00[7] by which McCaskill determined in her Revenue Agent's Report ("RAR") that Debtors' income was understated. Debtors protested the conclusions in the RAR, including the IRS's characterization of the amounts involved in Issue K as deductions by Debtors for bad debt. The IRS denied the protest[8] and ultimately filed the Claim on August 17, 2001. The Objection was filed on November 6, 2001. The Court conducted an evidentiary hearing restricted to Issue K on March 26 and 27, 2002.

## II. *The Issue*

The issue before the Court is whether or not Debtors in their 1997 income tax return improperly accounted for bad debt by the Non-accrual Experience Method (the

---

or" or, collectively, "Debtors" refers to one or more entities included in the 1997 return.

4. Debtors in a few instances acquired the stock of a Practice Group, the professional members of which then organized a new entity to contract with the Debtor.

5. This is an oversimplification of a process which will be analyzed in greater detail, *infra*.

6. The audit was later expanded to 1999 and 2000.1997, however, is the only year involved in the Claim, apparently because of the commencement of this Chapter 11 case on April 4, 2001, and a loss-carryback that would offset adjustments to later years (Debtors have argued in the Objection that the carry-back

would also offset the 1997 adjustments, but that issue is not before the Court).

7. The amount attributable to Issue K was $7,204,538.00. The IRS admits that some of this amount would have been properly deductible (as contract discounts, for example), but Debtors have failed to provide documentation to support the permissible (according to the IRS) deduction of any part of the adjustment. The IRS (and this Court for purposes of this decision) treats the entire amount as bad debt.

8. McCaskill's review following the protest resulted in minor adjustments that are not material to this Memorandum Opinion.

"NEM Method"), which they were not entitled to use.

## III.  *Positions of the Parties*

### A.  The IRS

The NEM Method allows certain accrual taxpayers to deduct from accrued accounts receivable a reserve for uncollectible accounts calculated on the basis of historic experience.  Since a 1986 act of Congress, the NEM Method permitted by 26 U.S.C. § 448(d)(5) has not been available to taxpayers such as Debtors.  Thus, Debtors, as accrual taxpayers, may only write off uncollectible accounts receivable under a specific write off method, which requires the taxpayer show that a given account receivable has become uncollectible.  *See* 26 U.S.C. § 166.

As evidence that Debtors have used the NEM Method, the IRS points to numerous statements of operations in which Debtors used a reserve for bad debt in calculating their income; a response to an information request from McCaskill, which acknowledges use of the NEM Method in calculating net revenue of the clinics (i.e., the Practice Groups); a post–1997 memo by Debtors' Chief Financial Officer; and the calculation in the 1997 tax return of income of ProMedCo of Southwest Florida, Inc. ("PMC–Naples").[9]  The Government also argues that Debtors did not calculate the Debtors' net income through reduction of gross revenues by the appropriate mathematical steps.  Finally, though the Government acknowledged during argument that the revenues of the Practice Groups were generated by medical professionals, and thus by the Practice Groups (as opposed to any of the Debtors), McCaskill testified that an account receivable, whether collectible or not, became property of a Debtor upon its generation through the performance of a medical service.[10]

### B.  *Debtors' Position*

Debtors do not dispute that they could not use the NEM Method.  However, they argue that each month [11] they simply purchased the accounts receivable from the Practice Groups.  The purchase price pursuant to their contracts was net of the portion of receivables expected to be uncollectible.[12]  Debtors assert that the proper way to account for the receivables for tax purposes is as having a value equal to Debtors' cost—or basis—in them.  Debtors assert that a "good" receivable not collected was so accounted for when it became uncollectible—the proper practice for an accrual taxpayer like the Debtors.

Debtors discount the significance of the inclusion in various financial reports of the calculation of their cost from the gross receivables of the Practice Groups, stating that use of the Practice Groups' gross receivables as a starting point was for

9.  Hereinafter any Debtor related to a Practice Group may be referred to as "PMC-[geographic location]".

10.  As discussed, *infra*, whether a Debtor and its corresponding Practice Group were combined into a single entity for tax purposes is significant to the Court's decision.  The IRS presented no authority in support of the proposition that a Debtor and its corresponding Practice Group were combined into a single entity for tax purposes, and there was no evidence that they were alter egos.

11.  Upon the initial acquisition of the assets of a Practice Group, accounts receivable were valued at net of bad debt.  The IRS does not argue that this was improper.

12.  During argument Debtors asserted they didn't even *acquire* any of the bad debts of the Practice Groups.  However, the net revenue/purchase price amount was calculated through an exclusion using a percentage of the Practice Groups gross receivables, not through exclusion of specific receivables as uncollectible.  Thus Debtors acquired every receivable regardless of collectibility.

"presentation purposes" only. Testimony during the hearing supports that use of the Practice Groups' gross revenues as a starting point in calculation of Debtors' profits was intended to emphasize the extent of Debtors' operations.[13]

The 1997 consolidating tax return entries for PMC–Naples were a mistake according to McCaslin, whose firm prepared the return, and, in any event, were not carried over into the determination of taxable income. Debtors also argue that they did not acquire receivables from the Practice Groups until they paid for them—as opposed to acquiring the receivables upon their generation. Debtors point out that it would have been illegal for them to engage in the practice of medicine, see *Sampson v. Baptist Mem'l Hosp. Sys.*, 940 S.W.2d 128, 137 n. 6 (Tex.App.-San Antonio 1996), *rev'd on other grounds*, 969 S.W.2d 945 (1998), and, therefore, the receivables had to be generated and initially owned by the Practice Groups. Debtors respond to the post–1997 memorandum of their Chief Financial Officer, Robert Smith, as irrelevant; as to the response to McCaskill's inquiry, Debtors note that the question related to net revenues of the *Practice Groups*.

Based on the evidence presented, Debtors contend that they did not use the NEM Method because the *Debtors* accrued no reserve for bad debts. Since Debtors properly accounted for uncollectible receivables, the adjustment from Issue K should be eliminated and the Claim correspondingly reduced.

## IV. *Discussion*

Both the IRS and Debtors asserted that the issue facing the Court is "simple." That may be, but just as beauty is in the eye of the beholder, here whether bad debts were improperly deducted by Debtors lies in the perspective of each party. The evidence is complex and not entirely consistent with either Debtors' or the Government's view of the case. The Court found each of the witnesses credible. Every witness was a Certified Public Accountant with impressive credentials and maintained a sincere, believable demeanor on the witness stand. That such knowledgeable witnesses could differ in their conclusions about the Debtors' taxable income suggests the application of the law to the facts in this case is not at all simple. Further, neither the parties nor the Court has found much guidance in case law (especially post–986) to assist the Court in its deliberations.

## A. Burden of Proof

A proof of claim constitutes prima facie evidence of its validity and amount. *See* FED. R. BANKR.P. 3001(f); 9 COLLIER ON BANKRUPTCY ¶ 3001.09[1] (15th ed. rev.2001). The party objecting to the proof of claim thus has the burden of going forward in contradicting the claim. *See* FED. R. BANKR.P. 3001(f); 9 COLLIER ON BANKRUPTCY ¶ 3001.09[1] (15th ed. rev. 2001); *see also In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir.1988). Once that burden is met, whichever party would have the burden of proof respecting the claim outside the bankruptcy will bear that burden in bankruptcy. With respect to contest of a claim for income taxes, the burden of proof falls on the objecting party—here Debtors. *See In re Domme* 163 B.R. 363, 366 (D.Kan.1994); *In re Placid Oil Co.*, 988 F.2d 554, 557 (5th Cir.1993).

13. Jack McCaslin ("McCaslin") and Karen Nicoloau ("Nicoloau"), both Certified Public Accountants, also testified that reconciliation of accounts for both Debtors and the Practice Groups tied to the gross receivables and so required their inclusion in financial statements.

In its brief and during argument, the IRS seemed to suggest that Debtors' burden was to show that the adjustment based on McCaskill's conclusions regarding Debtors' use of the NEM Method could only be overturned upon a showing that the adjustment was "clearly unlawful and arbitrary." *See, e.g.,* United States' Trial Brief, p. 14. The Court, however, concludes that this standard need only have been met had Debtors claimed entitlement to the use of the NEM Method. *See Bar L Ranch, Inc. v. Phinney,* 426 F.2d 995, 998 (5th Cir.1970). Since Debtors assert they did not use the NEM Method or take any bad debt deduction through accrual, they need only prove their case by a preponderance of the evidence. *See In re Fidelity Holding Co., Ltd.,* 837 F.2d at 698.

## B. The Court's Analysis

■ The focus in this case must be on the extent to which the accounts receivable, whether good or bad, constituted gross income to Debtors within the meaning of 26 U.S.C. § 61. Section 61 defines gross income to include "compensation for services," "gross income derived from business" and "gains derived from dealings in property." It seems to the Court that income to Debtors from the accounts receivable should fall into one of these three categories.

In order for the receivables to constitute compensation for services, Debtors would have had to perform the services giving rise to the accounts receivable. This they clearly did not do. First, it would be illegal for Debtors to earn income from the performance of medical services. Second, to attribute generation of the accounts receivable to Debtors' efforts would ignore the existence of the Practice Groups as separate entities,[14] whose medical employees performed the actual services for which the patients paid when they satisfied their accounts.[15]

Thus, the Court deduces that the role of the accounts receivable in calculating Debtors' gross income either involved the calculation of gross income derived from the conduct of their business (Section 61(a)(2)) or from gains from dealings with property (Section 61(a)(3)). The former of these appears to the Court the proper category in which to include the bulk of Debtors' gross income.[16]

**14.** The Court inquired several times of the Government if it was the position of the IRS that a Practice Group was effectively merged with a Debtor and so would be liable for the Claim (or at least a given Practice Group's share of the Claim). The Government consistently rejected this invitation by the Court to treat a Debtor and its corresponding Practice Group as a single entity. Hence the Court concludes for purposes of this Memorandum Opinion that this case did not involve the substantive consolidation outside of bankruptcy of any *Debtor with its corresponding* Practice Group.

**15.** Had the performance of medical services created an account receivable owned by a Debtor, the Debtor would have been performing medical services. Besides the issue of legality, if the medical professionals were working for a Debtor and performing services for the account of the Debtor, that Debtor would be entitled (as were the Practice Groups) to use the NEM Method.

**16.** As shall be seen from the analysis that follows, to the extent accounts receivable were collected to a greater or lesser extent than Debtors and the Practice Groups expected, there would arguably be income or loss arising from "dealings in property." In fact, as testified by Thomas Hall ("Hall"), for 1997 collections exceeded expectations by $97,000. There was some confusion in the testimony; McCaslin denied that Debtors bore any direct risk in connection with collectiblity, contending the Debtors' risk was indirect through reduction of Practice Group revenue. While it is true that a Practice Group's revenue suffered proportionally if a "good" receivable became uncollectible, to call a Debtor's risk

In determining the part played by the accounts receivable generated by medical services in arriving at Debtors' gross income for tax purposes, the Court must look to the contracts between Debtors and the Practice Groups. This is so because Debtors' business was performance of those contracts.

### 1. Treatment of Accounts Receivable in the Contracts.

The contracts are substantially similar (though not identical; for example, repurchase provisions hereafter referred to are not present in all contracts). For purposes of illustration, the Court will use the Amended and Restated Service Agreement (the "Agreement") between PMC–Lake Worth ("PMC–LW") and its corresponding Practice Group, Tarrant Family Practice, P.A. ("TFP").

Disposition of the accounts receivable under the Agreement turns on several definitions. Net Clinic Revenues, defined in ¶ 12.8 of the Agreement, means TFP's "gross billings . . . less any adjustments such as uncollectible amounts. . . ." The meaning of "Clinic" is "the medical care services" provided by TFP "utilizing the management services" of PMC–LW and the facilities bought from the Practice Group by PMC–LW. *See* Agreement, ¶ 12.1. Distribution Funds means "amounts remaining after Clinic Expenses have been deducted from Net Clinic Revenue." *See* Agreement, ¶ 12.5. Clinic Expenses (Agreement, ¶¶ 12.2 and 12.3) essentially include operating costs of the Practice Group other than compensation of medical professionals. The "ProMedco–LW Dis-

tribution" is defined in ¶ 12.13 as 15% of Distribution Funds.

Net Clinic Revenues are dealt with under Article 8 of the Agreement. Pursuant to ¶ 8.1, "[a]ll Net Clinic Revenue after deduction of Clinic Expenses and the Pro-Medco–LW Distribution" are "referred to as the 'Tarrant Distribution.'" Pursuant to ¶ 8.2, the Tarrant Distribution was to be paid to TFP by PMC–LW on the 15th day of the month following that for which Net Clinic Revenues were calculated. Under ¶ 8.4, payment of the Tarrant Distribution also effected the purchase by PMC–LW of "the accounts receivable of [TFP] arising during the previous month."

The Court finds that the Agreement provides for the purchase of TFP's accounts receivable by payment of the Tarrant Distribution. Regardless of how, where and when a receivable was booked, PMC–LW did not own the receivable until then. The IRS position is based on the contrary conclusion. McCaskill at p. 75 of the RAR, stated, "As [Debtors are] responsible for maintaining the books and records and computing distribution amounts . . . they are responsible for any adjustments." This would include the adjustment for bad debt.

The Agreement, by its definition of Net Clinic Revenues, required deduction of the amount of the uncollectible receivables [17] before PMC–LW acquired the receivables. Logically, therefore, any non-accrual experience method reserve against accounts receivable was taken when the receivables were owned by TFP. If a "good" receivable proved uncollectible or a "bad" receivable in fact paid after PMC–LW's pur-

"indirect" would ignore that the receivable was purchased.

**17.** Hall testified that the formula for determining the percentage of receivables that would be uncollectible was determined by the

Policy Council, and thus by agreement in the case of PMC–LW with TFP. This testimony is supported by the Agreement. *See* ¶ 2.2(f). Thus, as testified by Nicolaou, each Practice Group would have applied to gross billings its own percentage for predicting bad debt.

chase of the receivable, the gain or loss was then recognized and became part of the calculation of Distribution Funds for the month in which the event occurred. The Court holds that this manner of dealing with receivables by PMC–LW complied with 26 U.S.C. § 166. *See Carroll Furniture Co. v. Commissioner*, 197 F.2d 718 (5th Cir.1952); *Rhodes–Jennings Furniture Co. v. Commissioner*, 9 T.C.M. (CCH) 1019 (1950).

The Court's conclusion is supported by the portions of the Agreement dealing with termination. Specifically, ¶ 11.4, titled "Actions After Termination" requires that if the Agreement is terminated, both the Tarrant Distribution and the ProMedCo–LW Distribution must be paid through the effective date of termination. TFP is also required to buy back from PMC–LW all uncollected accounts receivable PMC–LW had previously purchased "at the book value" of the receivables on PMC–LW's books: a price that would exclude the reserve for uncollectible accounts taken prior to purchase by PMC–LW.[18] This would return each party to where it would have been had the Agreement not existed. Treating the Debtors and the Practice Groups as separate entities therefore inevitably leads to the conclusion that Debtors' gross revenues should be calculated net of, *inter alia*, any reserve proper at the Practice Group level for bad debts.

Based on the example of PMC–LW and its review of the contracts between other Debtors and their corresponding Practice Groups, the Court concludes Debtors did not use the NEM Method.

### 2. The IRS Objections

The Court finds without merit the objection of the IRS that the actual calculation of the Practice Group distribution and the corresponding Debtor's distribution did not proceed mathematically as it should have. The issue boils down to whether a + b = c is or is not the same thing as c–a = b. None of the numbers or the relationships among them change regardless of their arrangement and any variance from calculation by the steps preferred by the Government was immaterial to the end result.

Like the inclusion in publicly available documents of gross Practice Group revenues,[19] Debtors arranged their accounting data to highlight the volume of their business. To tie taxation to such arithmetic legerdemain would exalt form over substance, an approach the courts reject. *See Helvering v. A.L. Killian Co.*, 128 F.2d 433, 434 (8th Cir.1942).

The response to McCaskill's Form 4564 request # 11 (Government's Exhibit 50) suffers from the same problem. The request specifically relates to accounting for "physician group revenue." Debtors' response (a memorandum from Hall to

18. Not every agreement entered into by a Debtor included such provisions regarding termination. *See,* e.g., Service Agreement by and between ProMedCo of Abilene, Inc., and Abilene Diagnostic Clinic, P.L.L.C.

19. In almost every exhibit cited by the Government to show that Debtors on their financial statements improperly reserved against uncollectible receivables—i.e., used the NEM Method—the line items showing gross and uncollectible amounts are labeled as clinic or professional revenues. For example, the

statement of operations in Debtors' 1997 Annual Report begins with "Physicians Groups revenue, net." Annual Report, p. 12. The Overview presented at p. 13(¶ 3) and note 2 to the financial statements make clear that receivables were netted at the Practice Group level. The same accounting procedures were followed for Debtor's Annual Reports for 1998 and 1999, (*see* Government's Exhibits 5 and 6), for the 1997 Prospectus (*see* Government's Exhibit 10), and for the 1997 10K (*see* Government's Exhibit 11).

McCaskill dated April 10, 2000 (the "Hall Memo")) accordingly states that the NEM Method was used to account for bad debt at the clinic level—i.e., for calculating net income of the medical professionals. Giving the Hall Memo this meaning is consistent with the face of McCaskill's request. According to the testimony of Carol Schwartz, it was the meaning she gave to the request in formulating for the Hall Memo the answer to the key question (question 7).

The Government's argument that PMC–Naples reflected gross revenues and an allowance for bad debt in the 1997 consolidated return is also not persuasive. Every other subsidiary reflected gross revenues after computation of Net Clinic Revenues. McCaslin testified that the PMC–Naples discrepancy was a mistake, and the Court finds nothing in the record that would lead it to a different conclusion. Moreover, McCaslin testified that the PMC–Naples error did not carry over into the calculation of taxable income.

The IRS contends that Debtors' ability to pledge the receivables generated by the Practice Groups (see, e.g., Agreement, ¶ 8.4) means that Debtors owned the receivables prior to any reserve for bad debt. However, Government Exhibit 7, the Credit Agreement of December 17, 1998, between Debtors and their lenders, specifically recognizes that Debtors acquired the Practice Groups' receivables in accordance with the terms of the contracts (see ¶ 5.25 of the Credit Agreement). Until bought, the receivables could not be pledged.

Somewhat more troubling is the memorandum of Chief Financial Officer Smith. Though Debtors discount the memorandum's relevance because it was written after the 1997 tax return was filed, it offers a picture of Smith's views of Debt-

ors' income and expense. Debtors also argue that Smith's memorandum dealt with restructuring—but the fact remains that his discussion of receivables is not consistent with other documents and Debtors' position in this matter.

Similarly, McCaskill's argument that Debtors owned clinic receivables upon their creation finds some support in the way Debtors and the Practice Groups handled cash receipts (including monies paid by patients at the time services were rendered). Cash and cash items were required to be turned over to each Debtor for deposit in an account owned by the relevant Practice Group but accessible only by the Debtor (see, e.g., ¶¶ 3.18 and 3.19 of the Agreement). Periodically—the testimony indicated daily—this account was "swept" and the proceeds placed in an account owned by the Debtor. Through this process the Debtors received dominion over, control of and benefit from at least some receivables prior to their purchase under the contracts. While Debtors attempted to explain this discrepancy between actual events and the terms of the contracts by arguing the funds in question would be subject to a constructive trust,[20] the Court can easily understand how this affected McCaskill's perception. However, since the deposits were of cash or cash equivalents and, according to the testimony, were used as required by the contracts, this handling of funds does not itself affect the Court's conclusion that Debtor did not use the NEM Method: the NEM Method would have no application to a cash transaction. Moreover, the cash transactions were included in calculation of Net Clinic Revenues and so were paid for by the Debtors.

---

**20.** This contention does find some support in the termination provisions of the Agreement. As noted, though, not every contract included such provisions.

Finally, from the testimony it is clear that each Debtor and its corresponding Practice Group maintained joint records or general ledgers—presumably computer-stored data. Had the Government argued an alter ego or substantive consolidation theory *and* that the Practice Groups were jointly liable with Debtors for the Claim, this might be of greater significance. As it is, this joint maintenance of records does not change the Court's conclusion. As computers assume the functions of the hand-kept ledgers, mixing of different entities' accounting data is unavoidable. The Court is persuaded by the Debtors' evidence and argument that any mixing of accounting data through the use of software and computers owned by Debtors was in furtherance of efficiency (as Nicoloau testified, it made no sense to create multiple sets of "books" on the computers).

### V. *Conclusion*

Disposition of this matter must turn on the facts. While the evidence is not crystal clear, the great weight of the evidence—more than a mere preponderance—supports the Debtors' characterization of their gross income. Though Debtors purchased (counsel's argument to the contrary notwithstanding) all of the receivables of the Practice Groups, whether good or bad, the purchase price amounted to Debtors' basis in the receivables and their fair market value. The fair market value of the receivables is the proper amount of Debtors' gross revenues for computation of taxes. Concomitantly, Debtors did not use the NEM Method and their tax liability should not be adjusted as if they did. *See Carroll Furniture Co. v. Commissioner*, 197 F.2d 718 (5th Cir.1952); *Rhodes–Jennings Furniture Co. v. Commissioner*, 9 T.C.M. (CCH) 1019 (1950).

Since this determination only partly disposes of the Objection, the Court's ruling and order are interlocutory. This matter shall therefore be remanded to Judge Houser for further disposition consistent with this Memorandum Opinion.

### VI. *Order*

For the foregoing reasons, it is

ORDERED that the portion of the Internal Revenue Services' claim no. 115 attributable to the accrued deduction by Debtors of bad debt pursuant to the NEM Method be, and the same hereby is, disallowed; and it is further

ORDERED that this matter be remanded to Hon. Barbara J. Houser for further proceedings.